```
UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------
```
In re                                                                                              NOT FOR PUBLICATION

    TVGA Engineering, Surveying, P.C.,          Case No. 12-12665 K
      d/b/a TVGA Consultants, d/b/a Accident
      Reconstruction Plus, d/b/a Lockwood
      Geospatial Services,
                             Debtor

```
------------------------------------------------------------------
```
Wendy J. Christophersen, as Chapter 7 Trustee of
TVGA Engineering, Surveying, P.C.
d/b/a TVGA Consultants, d/b/a Accident
Reconstruction Plus, d/b/a Lockwood
Geospatial Services,

                             Plaintiff

           -vs-                                     AP No. 14-01104 K

James E. Pahel

                             Defendant
```
------------------------------------------------------------------
```

OPINION AND ORDER

       The Trustee's counsel has called attention to Adam N. Steinman's, *The Rise and Fall of Plausibility Pleading?,* 69:2 Vand. L. Rev. 333 (2016). At pages 367 through 381, it examines High Court decisions since I*qbal* and *Twombly*, which depended upon those cases for a result.

       In light of that analysis and the other arguments submitted by the Trustee's counsel, the Court finds that the 3rd Amended Complaint satisfies the

"plausibility" test. Consequently, the Motion to Dismiss is denied with regard to the *Twombly/Iqbal* theory.[1]

Unless the 11 U.S.C.§546(e) basis for the Rule 12(c) dismissal of the Third Amended Complaint is sustained, this A.P. would be appropriate for a final pre-trial order, and scheduling of a trial. As was previously ordered, the Trustee now shall have until October 24, 2016 to submit her response to the Defendant's §546(e) "safe-harbor" defense.[2]

SO ORDERED.

Dated: 	Buffalo, New York
		September 22, 2016

										s/Michael J. Kaplan
										―――――――――――
										U.S.B.J.

---

[1] The Defendant's *Stern v. Marshall* argument as to the preference cause of action is rejected in light of the District Court's Standing Order of Reference dated February 29, 2012. This Court will decide whether the Order applies if and when the Court is prepared to "decide" the merits of what remains of this Adversary Proceeding.

[2] The only extent to which this writer has considered that defense is contained in *In re* Batavia Nursing Home, LLC, Case No. 11-13223K, decision dated July 29, 2013. (Copy attached.)

2013 WL 3934237
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States Bankruptcy Court,
W.D. New York.

In re BATAVIA NURSING HOME, LLC, Debtor.
In re Geriatric Realty Corp., Debtor.
Melanie L. Cyganowski, Chapter 11 Trustee, Plaintiff
v.
Jeffrey Lapides, Defendant.

Bankruptcy Nos. 11–13223 K, 11–13225 K.
|
Adversary No. 12–1145 K.
|
July 29, 2013.

**Attorneys and Law Firms**

Lee E. Woodard, Esq., Harris Beach PLLC, Syracuse, NY, for Plaintiff.

Gregory Photiadis, Esq., Duke, Holzman, Photiadis & Gresens, LLP, Buffalo, NY, for Defendant.

William Savino, Esq., Bernard Schenkler, Esq., Damon Morey LLP, Buffalo, NY, for Defendant.

*OPINION, DECISION, AND ORDER GRANTING, IN PART, MOTION TO DISMISS*

MICHAEL J. KAPLAN, U.S.B.J.

**\*1** With benefit of the Defendant's July 13, 2013 submission, it appears clear that the $1.179 million buyout falls squarely within the teaching of a decision rendered by the United States District Court for the Southern District of New York; a case which this Court finds thoroughly persuasive. In *AP Services LLP v. Silva,* 483 B .R. 63 (S.D.N.Y.2012), the court granted the 11 U.S.C. § 546(e) "safe harbor" to persons who were situated precisely as the Defendant is situated here. (Only the dollar amount of the buyout is different, as discussed below.)[1]

According to that ruling, the Silvas founded and operated what became the third largest long-term care pharmacy in the United States. In 2007, they sold their shares in their corporation to a "blank check acquisition vehicle formed and funded ... for the express purpose of effectuating a business combination with an entity operating in the health care industry," as part of a leveraged buyout. The purchaser of the shares then merged with the Silvas' corporation and the surviving company's name was changed. The surviving corporation violated its loan covenants a year after the LBO. Three years after the LBO, it became a Chapter 11 debtor. It was liquidated, and the plaintiff in the action before the district court was the "litigation trust," an entity created by the Bankruptcy Court to pursue claims on behalf of the debtor's estate.

All of the arguments made by the Trustee in the present case were made by the litigating trust in that case. The district court ruled that "The plain language of Section 546(e), coupled with the general understanding among the courts of appeal that the definition of 'settlement payment' should be construed 'extremely broadly,' indicates that the transaction fits within the safe harbor."

The district court, relying (in part) upon *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C. V.,* 651 F.3d 329 (2d Cir.2011), and persuaded by the decisions of various other circuits, stated that § 546(e) is not limited to publicly traded securities but also extends to transactions, such as leveraged buyouts, involving privately held securities.[2] That Court examined a decision by the Eighth Circuit Court of Appeals which applied § 546(e) to an LBO in which a single family of controlling shareholders received $26.5 million in exchange for their stock. The Eighth Circuit, in the case of *In re Plassein International Corporation,* 590 F.3d 252 (8th Cir.2009), held that "Particularly because so much money is at stake, we question [plaintiffs'] assertion that the reversal of the payments—at least a portion of which were probably reinvested—would in no way impact the nation's financial markets. At the very least, we can see how Congress might have believed undoing similar transactions *could* impact those markets, and why Congress might have thought it prudent to extend protection to payments such as these." [Emphasis in original.] The district court in *AP* then said "The same can be said for the situation here, in which the Silvas received $106 million in exchange for their stock."

**\*2** Of course, the $1.179 million at issue here seems to be far more remote from the "financial markets" than the

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.    1

$106 million involved in the *AP* case, but even as to that much higher amount, the litigation trust contended that the safe harbor should not apply because "upsetting this LBO would not disrupt financial markets." The district court stated that that argument, if adopted, "would require a factual determination in each case as to whether upsetting a concluded LBO would have an adverse affect on the financial markets, thus casting all or at least many such transactions into uncertainty. In view of the Second Circuit's reasoning in *Enron,* that course is not properly open to this Court."

The present Court is persuaded that the focus of § 546(e) is the market for bonds (or other securities) such as those that yielded the monies used to buy out the Defendant here, and not upon the nature of the interest being bought out, or the manner in which that interest was initially acquired. A stated purpose of the bond issue (in the banking documents) was to buy out this Defendant. Presumably, any financial institution that might initiate or underwrite the bond issue, and any possible purchaser of the bonds, would consider that fact in connection with its determination as to whether the bonds would or would not be a good investment.[3] If any court were to declare that it is possible for bankruptcy of the borrower to undo any LBO funded by the issuance of securities, then the market for securities issued for the purpose of an LBO might be disrupted. To put a finer point on the matter, were any bankruptcy court to decide to conduct an evidentiary hearing into whether a small LBO might be so small as to fail to "disrupt the financial markets" (which was, of course, the stated focus of Congress in enacting the "safe harbor,") then every LBO in an amount beneath some indeterminate dollar amount that everyone would agree would "disrupt the financial markets" *per se* would be suspect. Consequently, the market for bonds (or other securities) that will fund such a "smaller" LBO would be disrupted. Reduced to the absurd, any inquiry into whether undoing a particular LBO might possibly "disrupt" the financial markets and cause the disruption that the statute sought to avoid.[4]

The Complaint is dismissed with regard to the $1.179 million buyout.

The balance of the Defendant's Motion to Dismiss remains under submission.

SO ORDERED.

**All Citations**

Slip Copy, 2013 WL 3934237

## Footnotes

1. That decision has been appealed on the basis that the funds used for the LBO came simply from loans, not from the issuance of securities. That question is not presented here, and the district court's analysis is fully convincing under the facts of the present case.
2. Although the Trustee in the present case suggests that the Debtor here was a partnership not a corporation, it is, in fact, a limited liability corporation. Perhaps the Trustee was misled by the fact that various banking documents leading up to the issuance of the bonds that were sold to provide the funds for the buyout made reference to one of the stated purposes of the bond issue as being to "buy out the remaining partner."
3. The Defendant owned 50% of the stock. The other owner was one Mark I. Korn. The fact that the buyout would eliminate any possible deadlock in corporate governance might have been material to a potential investor's analysis.
4. Given the long period of time between the buyout agreement and the buyout, it is possible (at the least) that the Defendant was instrumental in the buyout process. If the Debtor had simply borrowed the $1.179 million, and caused the lender to transfer that amount to the Defendant, any possibility of a § 546(e) "safe haven" would have become very remote. Probably the only matter before the Court (in the instant regard) would be the usual state-law fraudulent transfer claims that often follow an LBO. If 11 U.S.C. § 546(e) sweeps too broadly—if it insulates fraudulent transfers that are not "in actual fraud" (§ 546(e); 548(a)(1)(A)) then it is for Congress to correct.

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.