UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
----------------------------------------------------------------

In re                                                                    FOR PUBLICATION

    TVGA Engineering, Surveying, P.C.,                      Case No. 12-12665 K
     d/b/a TVGA Consultants, d/b/a Accident
     Reconstruction Plus, d/b/a Lockwood
     Geospatial Services,
                               Debtor
----------------------------------------------------------------
Wendy J. Christophersen, as Chapter 7 Trustee of
TVGA Engineering, Surveying, P.C.
d/b/a TVGA Consultants, d/b/a Accident
Reconstruction Plus, d/b/a Lockwood
Geospatial Services,

                              Plaintiff

         -vs-                                                    AP No. 14-1104 K

James E. Pahel

                             Defendant
----------------------------------------------------------------


Cheryl-Lane H. Bechakas
Bechakas & Bechakas, LLP
Townsend Square
5330 Main Street, Ste. 240
Williamsville, NY 14221

Attorney for Plaintiff, Wendy Christophersen, as Chapter 7 Trustee of TVGA
Engineering, Surveying, P.C.


Nicholas R. Pagliari
MacDonald, Illig, Jones & Britton LLP
100 State Street, Ste. 700
Erie, PA 16507-1459

Attorney for Defendant, James E. Pahel

OPINION AND ORDER

The Court finds that when a bank acts only as a substitute for cash, there is no 11 U.S.C. §546(e) shelter for payees receiving money from a debtor's account. If sued, they must defend on the merits. Not on §546(e) "safe harbor".

Section 546(e) provides a "safe harbor" for certain transactions involving transfers "by" a financial institution. Here, a bank's only involvement in a transfer was that it honored checks written by its depositor, the Debtor. The Court finds that the transfers of money were transfers "by" the Debtor, not "by" the Debtor's bank, as discussed below.

The application of section 546(e) has been addressed in only three contexts by the Second Circuit Court of Appeals, so far. This case presents a fourth context, not dispositively constrained by any decision of the Circuit. As is more fully discussed below, *In re Tribune Co. Fraudulent Conveyance Litigation*, 818 F.3d 98 (2d Cir. 2016), (hereinafter "*Tribune*"), involved an $8 billion LBO after *Tribune* borrowed $11 billion. An LBO always involves the taking-on of debt. Eleven billion. Such a thing is not involved in the present case. (Perhaps the eleven billion dollar debt in *Tribune* was provided from the securities or financial markets, either directly or indirectly.)

The second context is the retirement or redemption by a debtor of its own debt. In the case of *In re Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329 (2d Cir. 2011), (hereinafter "*Enron*"), the debtor drew down $1.1 billion from its revolving line of credit to pay off its promissory notes. Those notes had been publicly-traded securities.

In the case of *In re Quebecor World (USA) Inc.*, 719 F.3d 94 (2d Cir. 2013), (hereinafter "*Quebecor*"), the debtor paid $376 million to a financial institution that was serving as trustee for the holders of commercial paper issued by the debtor's affiliate.

This case presents an entirely different context. Back in the year 1996, the Debtor (which is not publicly traded) agreed with a shareholder (the Defendant) that the Debtor would buy back his shares, amounting to about one-third of the Debtor's ownership. Over a period of 65 months, the Debtor paid the Defendant approximately $259,000.00, mostly in monthly payments of $4,000.00.

The Debtor filed a voluntary Chapter 11 petition on August 24, 2012, and that case was converted to Chapter 7 on December 18, 2013. The Chapter 7 Trustee now seeks to recover said dollars (or at the very least, the amount paid within the year prior to the filing) on several theories. There have been several motions to dismiss, some granted in part, and we are on our Third Amended Complaint and a continuation of Mr. Pahel's dismissal motion. The final aspect of the pending motion to dismiss is whether 11 U.S.C. §546(e) bars this litigation by denying a bankruptcy trustee any opportunity to avoid certain transactions that might upset the financial markets or the securities markets, as described below.

The matter has been fully briefed, and the motion is now denied. (This is a Rule 12 motion and not a summary judgment motion. There shall be discovery in this case, and this decision does not foreclose a future motion to dismiss or summary judgment motion.)

DISCUSSION

Having reviewed the submissions, the Court finds that it is bound by case law to only one proposition relevant to this Motion -- a financial institution (such as a bank) need not have taken a "beneficial interest" in a security (such as a share of stock or a note or a bond) in order to trigger the §546(e) "safe harbor". *In re* Quebecor World (USA) Inc., *supra*.[1] (Payment of $376 million by that debtor to CIBC Mellon "as trustee for noteholders" sufficed.)

There is no authority binding this Court to ignore the persuasive value of the Eleventh Circuit decision in *In re Munford, Inc., 98 F.3d 604 (1996)*. (The fact that banks were instrumental did not mean that the transaction was not simply a payment "by" that debtor "to" shareholders). Or to ignore the bankruptcy court decision in *In re MacMenamin's Grill, Ltd., 450 B.R. 414 (Bankr. S.D.N.Y. 2011)*, (hereinafter "*MacMenamin*").[2]

---

[1] In *Enron*, *supra,* the magnitude and scope of the transactions (over a billion dollars paid to over two hundred noteholders) was cited as a reason <u>not</u> to exclude early redemption of commercial paper from the definition of "settlement payment." The Circuit said that three Circuits have explained their "application of the safe harbor to leveraged buyouts of private companies that involved financial intermediaries who served only as conduits. (Citations omitted) ... (T)hese courts explained that undoing long-settled leveraged buyouts would have a substantial impact on the stability of the financial markets, even though only private securities were involved and no financial intermediary took a beneficial interest in the exchanged securities during the course of the transaction. ... We see no reason to think that undoing Enron's redemption payments, which involved over a billion dollars and approximately two hundred noteholders, would not also have a substantial and similarly negative effect on the financial markets."

In *Tribune*, the debtor had borrowed eleven billion dollars (possibly by means of the securities markets) and paid eight billion of it to shareholders as part of an LBO. According to the Circuit, the $8 billion was transferred to a "security clearing agency" or other "financial institution" acting as "intermediaries".

[2] The fact that the bankruptcy court's conclusion in *Quebecor* was affirmed by the Second Circuit does not mean that the Circuit adopted the lower court's view that Judge Drain's resort to legislative history of §546(e) was incorrect. Not only did the Circuit narrowly confine its remarks to the facts of that case, it did not comment upon the fact that the text of its own decision in *Enron* belied (in this writer's view) Judge Peck's view that the statute is unambiguous. (The majority stated "Congress enacted §546(e)'s safe harbor in 1982 as a means of 'minimiz[ing] the displacement caused

Assuming the allegations of the Third Amended Complaint to be true (as we must upon the Defendant's Motion to Dismiss), we can edit the statute to read as follows, ...

"The Trustee, may not avoid a transfer that is a settlement payment made by or to (or for the benefit of) a financial institution, or that is a transfer made by or to (or for the benefit of) a financial institution in connection with a securities contract."

Even if we assume, *arguendo*, that each payment was a "settlement payment" or was a payment "in connection with a securities contract," these payments were not made "by or to (or for the benefit of)" a financial institution. These were payments made "by" the Debtor "to" Mr. Pahel.[3] If the Debtor had bought money orders from the local, closely-held supermarket chain, and Mr. Pahel had cashed them at his local store in the same chain, §546(e) could not possibly apply.[4] The avoidability of $258,950.62 in transfers, to benefit the Debtor's other creditors, cannot be permitted to turn upon the use of a bank, rather than a supermarket chain, as the vehicle for transferring what otherwise would be a <u>cash</u> payment.[5] In other words, the Debtor's checking account was a substitute for cash.

---

in the commodities and securities markets in the event of a major bankruptcy affecting those industries.'" Citations omitted.) This writer agrees with the *Enron* Dissent (Koeltl, J.) that the statute is totally ambiguous in one or more respects, and agrees with the *MacMenamin* Court (Drain, BJ.) that the statute can lead to results that are absurd. Resort to legislative history is indeed necessary, in this writer's view. That said, *Quebecor* was a motion for summary judgment. Not only had there been discovery, but there also had been one or more evidentiary hearings. It is "too soon" to end this Adversary Proceeding.

[3] In the *Batavia Nursing Home* case, 2013 WL 3934237(Bankr. W.D.N.Y. 2013), the buyout payment was made "by" a wire transfer from Bank of New York, Mellon, which was the Indenture Trustee for the Bondholders who loaned to that debtor the funds used to accomplish the LBO.

[4] Money orders in supermarket chains are indeed regulated under the Patriot Act, etc., but are not included as "financial institutions" under Title 11. (11 U.S.C. §101(22))

[5] See the final paragraph in this Opinion.

It is useful to consider Judge Drain's analysis in *MacMenamin, supra*, and Judge Peck's comments (in dictum) upon that analysis in *Quebecor*, 453 B. R. 201 (Bankr. S.D.N.Y. 2011). Judge Drain found it necessary to refer to the legislative history of the statute due to its ambiguous nature. "...[In] the light of section 546(e)'s textual context, which apparently focuses, in the midst of a circular and therefore ambiguous set of definitions, on the trade or business of securities transactions, reference to the legislative history is warranted." It was Judge Peck's view that Judge Drain's analysis of the legislative history lead to his belief that Congress' intent behind §546(e) was to "shield from avoidance transfers that involve an 'entity in its capacity as a participant in any securities market' or that 'pose any danger to the functioning of any securities market.' According to *MacMenamin,* the statutory safe harbor scheme created by Congress aims to reduce systemic risk to the financial markets - an objective that is not threatened by the avoidance of such a small scale private stock transaction."

Judge Peck opined that resort to legislative intent was not appropriate. But in respect for his colleague's opposing view, he offered extensive dicta regarding why the matter before the court in *Quebecor* would enjoy the protection of §546(e) even under Judge Drain's "legislative intent" analysis. He said "(t)he Disputed Transfer is sufficiently material in amount as to be potentially significant from a systemic point of view, and avoiding a transaction such as this conceivably could impact the original issue or secondary markets for private placement indebtedness."

This Court finds that resort to the legislative history is required (as per *MacMenamin*, and Judge Koeltl's Dissent in *Enron*), that that intent is as stated in *Enron* and

*MacMenamin*, and that the fact that payments were by check did not mean that the payments were not simply payments "by" TVGA "to" the Defendant.  The Debtor's bank was simply a substitute for cash.  This writer sees no threat to anyone in any banking, financial securities or any other markets when a bank simply honors a $4,000 check or even a succession of such checks.  There may be pedantic arguments, but none that can avoid discovery.

The remainder of the Motion to Dismiss the Third Amended Complaint is now denied.

The Defendant shall have 30 days in which to Answer the Third Amended Complaint.  Thereafter, a Rule 16 conference will be scheduled.

SO ORDERED.

Dated:  Buffalo, New York
        December 1, 2016

                                          s/Michael J. Kaplan
                                          _____
                                          U.S.B.J.